# Lock Haven Bridge Co., Appellant, *v.* Clinton County.

[Marked to be reported.]

*Bridges—Eminent domain—Constitutional law.*

A provision in the charter of a bridge company by which the legislature reserves the right to purchase the bridge after the expiration of twenty years by paying to the company "a sum of money, which, together with the dividends declared, shall equal the cost of constructing said bridge and ten per centum per annum interest thereon," does not imply a relinquishment by the legislature of any right by which the property of the company may be taken for public use.    The power of eminent domain is one of the essential incidents of sovereignty, and one legislature cannot contract with a corporation that its property shall not be taken by the exercise of eminent domain.

*Proceedings to free toll bridge—Evidence.*

In proceedings to free a toll bridge, evidence as to the erection and maintenance of free bridges a short distance below the one in question is competent and relevant. The natural effect of the free bridges would be to attract at least some travel that would otherwise pass over the plaintiff company's bridge, and to that extent affect its income from tolls. That and other circumstances affecting the earning power and value of the property are proper for the consideration of the jury.

Argued May 9, 1893. Appeal, No. 151, Jan. T., 1893, by plaintiff, from judgment of C. P. Union Co., Dec. T., 1891, No. 49, on verdict for plaintiff. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and THOMPSON, JJ.

Proceedings to free bridge. Before MCCLURE, P. J.

At the trial it appeared that plaintiff was incorporated under act of March 4, 1850, P. L. 782.

Section 13 of the act is as follows : " At any time after the expiration of twenty years from the time of completing said bridge, it shall be lawful for the commonwealth to purchase the same, by paying to the said company a sum of money which, together with the dividends declared, shall equal the cost of constructing said bridge and ten per cent per annum interest thereon."

Plaintiff offered to prove what the Lock Haven bridge cost in its original construction, and what the receipts from tolls have been from said bridge from year to year to the present; what dividends have been allowed and paid to the stockholders from the time of the completion of the bridge to the time it was taken for public use. In order to show what amount of money the corporation is entitled to receive under its contract with the commonwealth.

Defendant objected for the following reasons : (1) That the value of the structure at the time of its seizure by the defendant is the true measure of damages. (2) That the original cost is irrelevant and immaterial. (3) The offer as made is irrelevant.

By the Court: We are of the opinion that in this proceeding the measure of damages is the value of the bridge and franchise at the time of the taking, and that the charter of the bridge company is not such a contract between the bridge

company and the commonwealth as could not be affected by subsequent legislation providing for the payment of an adequate compensation for the bridge upon its taking by the county of Clinton. For the present so much of the offer as proposes to show the cost of the structure is rejected. We will admit the evidence tending to show the dividends declared by the company to the stockholders as an element in determining the value of the structure and franchises. Exception. [1]

Plaintiffs offered to prove how much the Lock Haven bridge originally cost, before it was completed, ready for travel and the taking of toll; how many and the amount of dividends declared and paid to the stockholders, from the completion of the bridge to the time the same was taken by Clinton county. This evidence is offered for the purpose of furnishing the basis of determining the amount to be paid to the plaintiff for the taking of the said bridge, under and in pursuance of the contract between the Commonwealth of Pennsylvania and the Lock Haven Bridge Company, contained in the thirteenth section of the act incorporating said company, approved March 4, 1850.

Defendants objected to this offer: (1) Because it is not evidence for the purpose offered. (2) Because the evidence does not properly fix the damages which the county must pay for the taking of the bridge. (3) Irrelevant.

Per Curiam: For the reasons stated in ruling plaintiffs' offer No. 1, the objections are sustained and the evidence rejected. Exception. [2]

Defendant proposed to ask his witness the following: Q. State whether there are bridges other than this in question crossing the Susquehanna river upon the road leading to and from Lock Haven where this bridge is located; if so, how far they are located from the Lock Haven bridge, and are they free or toll bridges; if free bridges how long have they been such? This is offered for the purpose of showing the jury the facilities to the public for crossing free of charge this same stream, the Susquehanna river, which is spanned by the bridge in question, and enable the public to reach Lock Haven at the same point at which the bridge in question terminates.

Mr. Kress: Objected to: (1) Because it is incompetent to show by this witness when those bridges were made free. It is

a matter of record and the record would be the best evidence. (2) It is irrelevant unless it is offered to be shown in connection with this, that the making of those bridges free reduced the tolls of this bridge.

The Court: We will allow you to ask the question of this witness whether, at the time the bridge was taken, there was a free bridge one mile away.

The witness : " There was a free bridge one mile away from the Lock Haven bridge, I believe."

By Mr. Hipple : " Where were those bridges, on what road ? A. On the road leading from Lock Haven to Jersey Shore, crossing two branches of the river, one at the upper and one at the lower end of the island, a mile below Lock Haven. Q. Was that the main road leading through Clinton and into the adjoining counties ? A. I think it was, leading into the eastern part of the county."

Mr. Hipple : We offer to prove that during the years covered by plaintiff's proof of dividends and moneys received by the Lock Haven bridge, except a part of the year 1890 and subsequent, these bridges had been toll bridges the same as the Lock Haven bridge; and that after the flood of 1889, they having been carried away, they were rebuilt as free bridges and opened in 1890 as such.   Question allowed and exception. [3]

The witness answered in the affirmative.

Depositions of witnesses were received, under objections and exceptions, to the effect that the travel on the bridges that were freed increased, and the travel on plaintiff's bridge diminished, thereafter. [4, 5]

The court charged in part as follows :

" [The question is one of damages, and the measure of these damages is a just compensation to the bridge company for the injury they have sustained by reason of the taking of this bridge, and in arriving at that you should determine the value of the bridge, the piers and abutments, the tollhouse and superstructure of the bridge and the franchises, or the right to maintain and operate a bridge there and take tolls from the traveling public.] [9] . . . .

" [A number of things enter into it, the value of the superstructure and substructure of the bridge and the value of the tollhouse, the property of the company there, and the fran-

chise, the right to take toll, are all to be included; and we have admitted this evidence of the value of these different parts of the bridge in order that you may arrive at its value, and taking it in connection with the value of the franchise, or right to take toll, this must all be considered by you in making up your verdict of the damages which this company have sustained by the taking of the bridge by the county.] [10]

" [You have heard the figures gone over as to the amount of the receipts of the company during the last seven years, from 1884 down to 1891, and the amount of expenditure, and you can calculate from that about what the net income of this bridge would be; as I understand, Mr. Harris has stated that the ordinary expenses of the bridge were in the neighborhood of eight hundred dollars per annum, which he itemizes as toll keeper, treasurer and managers' salaries, gas and taxes, and all these things should be considered by you in determining what the net income of this company would be each year.] [11]. . . .

" [There is another element you will take into consideration in the valuation of this bridge, and that is its liability to be destroyed by floods, by ice and by storm. The evidence is that in 1859 a portion, or may be the whole, of this roof, I do not recollect, was blown off the bridge; that in 1865 one span was carried away and another injured; that in 1876 the bridge was rebuilt and placed four feet higher than it had been before, and that again in 1889 it was again damaged by the flood; the spans are out of line and the loggerheads knocked from it, and there is evidence that the north pier is in a strong current and must be riprapped pretty often, as some of the witnesses said, and some said every year. This is evidence to show you the character of the structure and its liability to be destroyed, and it was allowed to go in with the other evidence, for you to determine what this property is worth to the bridge company."] [12]

" [It is contended on the part of the plaintiff that it matters not whether the bridge below was a free bridge or not; that the tolls they received were the same as before. That is a question for you to determine; you have the figures before you and you will determine the question from the evidence.] " [13]

Defendant's points were as follows:

" 1. That the franchise of the plaintiff consists of the right to construct and maintain a bridge and to charge tolls for the

use of the same, and that the value of this franchise cannot be ascertained as a separate and distinct item of damage, but must be considered in connection with the property to which it appertains." Affirmed. [14]

" 2. That the jury cannot allow, as a measure of damages, a gross sum that would yield an income equal to the past or anticipated net profits from the bridge. *Answer :* This point is affirmed and I refer you to what I have said in the general charge as to the measure of damages." [15]

" 3. If the jury believe from the evidence that there was a bridge free for all to travel at the Great Island, from one to two miles below the bridge in dispute, that this must be considered in ascertaining the measure of damages. *Answer :* This point is affirmed.   You will recollect the testimony of the witnesses as to the distance the Great Island bridges are away, to which I have referred in the general charge." [16]

" 4. If the jury believe from the evidence that the north pier of the bridge and the abutment on the same side were exposed to an extraordinary current which washed the foundations of the pier, and further find that the bridge was exposed to liability of destruction or damage from floods, ice, floating logs and violent winds, which at times actually damaged it, that this must be considered in estimating the value of the structure.   *Answer :* Not affirmed as put.   There is no evidence as to washing the foundations of the abutment on the north side of the river.   But if the jury believe from the evidence that the north pier of the bridge and the abutment on the same side of the river was exposed to an extraordinary current which washed the foundations of the pier, and further find that the bridge was exposed to liability of destruction or damage from floods, ice, floating logs and violent winds, which at times actually damaged it, this must be considered in estimating the value of the structure, as I explained to you in the general charge." [17]

" 5. If the jury find from the evidence that the stone in the abutments and piers was inferior in quality, badly laid up, and that there were cracks in the same at the time of the taking of the bridge, that this must be considered by the jury in fixing the value." Affirmed. [18]

"'6. If the jury find from the evidence that at the time the defendant took possession of the bridge the arches were strained,

the structure out of line, that it required a new roof, was destitute of proper braces, and was otherwise damaged, that all this must be considered in estimating the value." Affirmed. [19]

" 7. That the jury in estimating the value of the structure must consider its age, its liability to injury or destruction by floods, ice and storm." Affirmed. [20]

Verdict and judgment for plaintiff for $14,141.25. Plaintiff appealed.

*Errors assigned* were (1–5) rulings on evidence ; (9–20) instructions ; quoting instructions, and bills of exceptions and evidence.

*W. C. Kress* and *John H. Orvis, J. Merrill Linn* with them, for appellant.—A state may grant franchises to a corporation upon condition that the grantee shall assume certain duties or obligations : Fletcher v. Peck, 6 Cranch, 135 ; Boston R. R. v. Salem R. R., 2 Gray, 1 ; College v. Woodward, 4 Wheat. 518 ; Enfield T. B. Co. v. Connecticut R. R., 7 Conn. 44 ; People v. Platt, 17 Johns. 215 ; Derby Turnpike Co. v. Parks, 27 Am. Dec. 700.

The remedy being provided by the charter, that remedy must be pursued : Royersford Bridge, 112 Pa. 627 ; Charles River Bridge v. Warren Bridge, 7 Pick. 462 ; Green v. Biddle, 8 Wheat. 1 ; 1 Kent, 449.

If the state were not bound by this clause in fixing the compensation in proceedings to take the bridge by the right of eminent domain, then this section is nugatory, and the promise was only made to deceive : Norman v. Heist, 5 W. & S. 171.

This act like every other act and charter of the same kind, is a contract between the state, on the one part, and the subscribers accepting the act of incorporation, on the other ; and therefore what they both intend by the terms used, if we can ascertain it, forms the true construction of the contract : Boston R. R. v. Salem R. R., 2 Gray, 1.

This section was also intended as a protection to the state : Enfield T. B. Co. v. Hartford R. R., 42 Am. Dec. 721 ; Dillon, Mun. Corp. § 612.

Where corporate property is taken by virtue of the right of eminent domain, the grantee does not suffer loss. The ex-

clusiveness of the grant, and the agreement against interference with it, constitute elements in its value to be computed in assessing compensation for its condemnation: State etc. R. R. v. Hudson T. R. R., 38 N. J. L. 558.

The taking by the right of eminent domain is a purchase. It is not an alteration, modification or repeal of the charter, it is the enforced purchase of its property: Backus v. Lebanon, 35 Am. Dec. 469; Burt v. Merchant's Ins. Co., 106 Mass. 356; Hackett v. School Dist., 150 Pa. 220.

*T. C. Hipple* and *J. C. Bucher*, *J. T. Baker* with them, for appellee.—Plaintiff's construction of the act of 1850 would amount to an extinction of the right of eminent domain, and especially of one essential element thereof, viz., the right of the commonwealth to take property for public use upon payment of just compensation for the injury sustained, and it would be an abridgment of that right which it was beyond the power of the legislature to enact so as to bind the commonwealth or subsequent legislatures: Royersford Bridge, 112 Pa. 627; Mills, Em. Dom. § 40; Backus v. Lebanon, 11 N. H. 19; Cooley's Const. Lim. § 283; Garrison v. New York, 21 Wal. 196.

The authorities cited by plaintiff merely establish that franchises or privileges arising out of charter contracts may be valued and assessed along with the bridge structure proper, and if it has value as a franchise or privilege that value may be included in the compensation or damages allowed.

If a statutory remedy is not complete in ascertaining damages and securing their payment, the common law remedy may be pursued: Mills, Em. Dom. 88.

The pursuit of one remedy waives the right to the other: Mills, Em. Dom. 88; Pinkham v. Chelmsford, 109 Mass. 225; Herman, Estoppel, § 1, 501; Cooley's Const. Lim. 695.

If any doubt arise as to the actual purpose and object of this section 13 and as to how it shall be construed, then plaintiff must for that reason fail, because it cannot have any forced construction of its charter, nor can it depend upon inference or implication. Franchises cannot be created by or arise from implication or intendment: Charles River Bridge v. Warren Bridge, 11 Pet. 420; Mills, Em. Dom. § 39; Cooley's Const. Lim. 488; Penna. R. R. v. Canal Com'rs, 21 Pa. 22; R. R.

v. Com'rs, 37 N. J. L. 239; Backus v. Lebanon, 11 N. H. 19; Bethlehem Toll Bridge, 12 Pa. C. C. R. 311.

OPINION BY MR. CHIEF JUSTICE STERRETT, Oct. 2, 1893:

This case had its inception in the petition presented to the quarter sessions of Clinton county under the act of May 8, 1876, P. L. 131, and its supplement of May 3, 1878, P. L. 41, setting forth that the plaintiff company's bridge is necessary for public travel and that payment of tolls thereon is burdensome to the traveling public, and praying that the same shall be taken as a county bridge, etc. The viewers, appointed by the court, found the material facts, substantially as averred in the petition, and assessed the damages sustained by the bridge company, by reason of the taking of its property for public use, at $12,500. Their report, having been referred to the grand · jury, was duly approved by them, and afterwards by the court. Thereupon the bridge company appealed, and subsequently the venue was changed to Union county. In August, 1891, an issue was formed between the bridge company, as plaintiff, and the county of Clinton, as defendant, "for the purpose of determining by a jury trial the amount of damages sustained, if any, by the said company for the taking of its bridge and having it declared a free bridge. . . . The plaintiff to file a statement of its claim for damages, to which the defendant shall plead non assumpsit." In its statement filed, the company, after reciting the proceedings leading up to the formation of the issue, etc., averred that in April, 1891, when said petition was presented, its bridge property and franchise were worth $50,000, and claimed that sum as its damages. In April, 1892, the issue was tried and resulted in a verdict for $14,141.25 in favor of plaintiff. From the judgment entered on that verdict this appeal was taken by the company.

As we have seen, the sole purpose of the issue was to ascertain and determine, by the verdict of a jury, the amount of damages sustained by the plaintiff company by reason of the taking of its property, consisting of the entire bridge structure, including approaches thereto, tollhouse, etc.; together with the franchise or right to maintain the same and collect tolls, etc. The central question of fact, involved therein, is the money value of said property and franchise, at the time the same were so

taken.   As bearing on that question, testimony was properly
received for the purpose of showing the size of the structure,
mode of construction, kind and quality of materials used therein,
its state of repair, earning power, and other matters affecting
its value at the time in question.   Neither repetition of said
testimony, nor special reference to any portion thereof, is nec-
essary.   It was fairly submitted to the jury with adequate in-
structions as to the law applicable thereto.   The only question
for our consideration is whether the learned judge erred in ei-
ther of the particulars assigned as error.

It was strenuously contended that under section 13 of the
act of 1850, incorporating plaintiff company, the proposed tes-
timony, embraced in the offers recited in the first two specifica-
tions, was both competent and relevant.   That section provides
as follows : " At any time after the expiration of twenty years
from the time of completing said bridge, it shall be lawful for
the commonwealth to purchase the same by paying to the said
company a sum of money, which, together with the dividends
declared, shall equal the cost of constructing said bridge and
ten per centum per annum interest thereon."   It is claimed
that this provision has all the force and effect of a contract be-
tween the company and the commonwealth, and furnishes the
only measure of the damages or compensation to which the
company is entitled for its bridge property and franchise, wheth-
er the same be taken for public use under the right of eminent
domain, or purchased by the commonwealth in the manner above
specified.

The very able and ingenious argument of learned counsel, in
support of this position, has failed to convince us that the legis
lature ever intended to thus surrender or barter away the right
of eminent domain and substitute in lieu thereof the provision
above quoted.   In the first place, it was powerless to do so ;
but, assuming, for argument sake, that it possessed the power,
it did not attempt to exercise it.   To hold otherwise, would in-
volve a strained construction of the language employed, and
convert a mere reservation of the privilege of purchasing the
company's bridge, etc., after the lapse of twenty years, and on
specified terms, into an implied contract, on the part of the
commonwealth, that the property should never be taken for
public use in any other way or upon any other terms than those

stated in the section. That would be doing great violence not only to established rules of construction, in such cases, but also to the language of the section itself. Charters are to be construed most strongly against the grantees and in favor of the public. They are to be strictly construed, because in every such case the just presumption is that the commonwealth has granted in express terms all that she intended to give: Mills on Em. Dom., sects. 39, 40, 489, 490; Cooley's Const. Lim. 488; 6 Am. & Eng. Enc. of Law, 522; Penna. R. Co. v. Canal Commissioners, 21 Pa. 22; Railroad Co. v. Commissioners, 37 N. J. Law, 239; Backus v. Lebanon, 11 N. H. 19; Charles River Bridge v. Warren Bridge, 11 Peters, 420.

In Backus v. Lebanon, supra, Mr. Chief Justice PARKER said: "Nor does the provision of the charter by which the legislature reserved the right to purchase the property with the consent of the corporation (given through their acceptance of the charter) prove, by any means, that the right of eminent domain was thereby surrendered; even if the legislature might be supposed to possess the power to make such surrender. That provides a mode by which the government might, after a certain period, come into the possession of all the property of the corporation; and a mode which could not have existed but for the provision in the charter itself. But this reservation does not seem to us to imply, in any manner, a relinquishment of any right by which the property of the corporation, or a part of it, might be taken for public use."

But aside from the absence of anything like an express or even implied intention, on the part of the general assembly of 1850, to surrender the right of eminent domain even for the term of twenty years, it lacked the power to thus deprive any subsequent legislature of the right to authorize the taking of the bridge property for a higher public use. Such taking was authorized by the act of 1876 and supplement thereto; and the record shows that the proceedings in this case, from beginning to the end, were under the provisions of those acts. "The power of eminent domain is one of the essential incidents of sovereignty, and one legislature cannot contract with a corporation that its property shall not be taken by the exercise of eminent domain. Such provision has no binding force upon a subsequent legislature. There is no such thing as an extinc-

tion of the right of eminent domain: " Mills, Em. Domain, sec. 40; 6 Am. & Eng. Enc. Law, 533, 535; Hyde Park v. Oakland Cemetery Association, 119 Ill. 141.

Other reasons might be suggested in support of the learned judge's ruling, but we think the absence of express or implied legislative intention to surrender or restrict the exercise of the power of eminent domain is sufficient, without more, to justify the ruling complained of in the first and second specifications.

There was no error in receiving the testimony referred to in the third, fourth and fifth specifications, nor in the instructions complained of in the thirteenth and sixteenth specifications. The testimony, as to the erection and maintenance of free bridges a short distance below the one in question was neither incompetent nor irrelevant. The natural effect of the free bridges would be to attract at least some travel that would otherwise pass over the plaintiff company's bridge, and to that extent affect its income from tolls. That and other circumstances affecting the earning power and value of the property were properly for the consideration of the jury.

Special consideration of the remaining assignments of error is unnecessary. An examination of them has failed to convince us that there is any error in either of them that would justify a reversal of the judgment.

Judgment affirmed.

[Marked to be reported.]